425 So.2d 534 (1982)
CITIZENS OF the STATE of Florida, Appellants,
v.
PUBLIC SERVICE COMMISSION and Florida Power Corporation, Appellees.
No. 61101.
Supreme Court of Florida.
December 16, 1982.
*535 Jack Shreve, Public Counsel and J. Roger Howe, Associate Public Counsel, Tallahassee, for appellants.
William S. Bilenky, Gen. Counsel and Paul Sexton, Staff Counsel, Florida Public Service Com'n, Tallahassee, and Sylvia H. Walbolt and Robert W. Pass of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, and S.A. Brandimore, Richard W. Neiser and James A. McGee of the Office of the Gen. Counsel, Florida Power Corp., St. Petersburg, for appellees.
ADKINS, Justice.
This cause is before us to review a Public Service Commission order approving a permanent rate increase sought by Florida *536 Power Corporation. We have jurisdiction. Art. V, § 3(b)(3), Fla. Const.
On April 24, 1980, Florida Power petitioned the Commission for a permanent rate increase to increase annual revenues by $99 million. The petition also sought an interim rate increase designed to yield an additional $61,173,000 per year. Prior to filing its petition, Florida Power had requested the Commission to approve use of a projected 1980 test year for its upcoming rate case. The Commission held informal workshops to consider Florida Power's ability to furnish reliable data for the 1980 test period. Interested parties were invited to file briefs addressing the issue of the Commission's authority to employ projected test years at the second workshop. Public Counsel also participated in the workshops. On April 7, 1980, the Commission approved Florida Power's request and the petition was subsequently filed.
The Citizens, through Public Counsel, intervened and filed a motion to deny the proposed interim increase. On May 21, 1980, by Order 9386, the Commission suspended Florida Power's proposed rates, requesting legal briefs concerning whether Maule Industries v. Mayo, 342 So.2d 63, (Fla. 1976), permitted interim rates based on projected data and requiring Florida Power to submit supplemental filings. Florida Power & Light Company intervened and filed a brief. Florida Power also filed a brief.
The Commission ultimately voted to award to Florida Power an interim increase of approximately $54.6 million, subject to refund, and issued Order No. 9451 on July 15, 1980, to that effect. In this order, the Commission concluded that Florida Power had sufficiently demonstrated a present need for an interim increase in revenues as indicated by the projected 1980 data and corroborated by other historical data.
Order No. 9451 never became a final order. Public Counsel petitioned for reconsideration of the order and the Commission held a public hearing on the petition to determine whether certain unrecovered fuel costs should have been included in the interim rate increase. By Order No. 9577, the Commission reduced the interim rates to $40,134,000 and all excess funds collected under the previous order were refunded.
A status conference had been held, prior to issuance of Order No. 9577, at which time Florida Power agreed to extend the eight-month suspension period and to file additional data to support its test year assumptions and projections. The full rate case hearings were held during January and February 1981. At that time, Florida Power also filed historic data for the 1980 test year to allow the Commission to test the reasonableness of the projections upon which the case had proceeded. The Commission's final order, Order No. 9864 issued on March 11, 1981, confirmed the revenues collected under the interim rates and approved permanent rates yielding additional annual revenues of approximately $58.4 million. The Commission made the new rates applicable to all meter readings made on or after thirty days from the date of the vote and decision on the petition, or March 22, 1981.
Public Counsel petitioned for reconsideration of Order No. 9864. By Order No. 10162, issued July 29, 1981, the Commission granted in part and denied in part the Citizens' petition. Order No. 10162-A was also entered to amend Order Nos. 9864 and 10162.
The first issue that Public Counsel presents for our review is whether the allowance of projected construction work in progress (CWIP) in the rate base is prohibited by section 366.06(2), Florida Statutes (1979), and conflicts with prior decisions of this Court. The statute reads, in applicable portion:
The commission shall investigate and determine the actual legitimate costs of the property of each utility company, actually used and useful in the public service, and shall keep a current record of the net investment of each public utility company in such property which value, as determined by the commission, shall be used for rate-making purposes and shall be the money honestly and prudently invested *537 by the public utility company in such property used and useful in serving the public... .
Although Public Counsel does not challenge the projected test year concept generally, he argues that section 366.06(2) prohibits the inclusion of projected test year CWIP in the rate base. His objection rests on the directive to determine the "actual legitimate costs of property ... actually used and useful in the public service" and that it "keep a current record of the net investment of each public utility in such property which value ... shall be used for rate making purposes." Public Counsel's first contention is that the statute clearly limits the Commission to the use of historic cost data in calculating rate base. Apparently, he contends that "current record" refers exclusively to a record of investment that has already been made at the time the rate increase petition is filed. Florida Power argues that the statutory language is only intended to prevent the use of outdated information and to ensure that the most up-to-date data is employed in predicting what the utility's requirements will be during the period in which the new rates will be in force and, therefore, it is consistent with the function of rate-making to permit the Commission to use the record it has at the time rates are set as its "current record."
We find no basis to distinguish between using projected CWIP as opposed to using any other projected component of rate base. The projected test year 1980 in the case sub judice had become an historic test year by the time the full hearings were commenced in January of 1981. There was a deviation between the projected CWIP allowed and historic CWIP of 1.4%. However, the actual net operating income of Florida Power on a systemwide basis was shown to be less than what had been projected by the company. The end result was greater actual revenue requirements than those sought under the projected data. Inasmuch as Public Counsel has not challenged the projected test year concept generally and the Commission has concluded that an adequate basis has been provided for analysis of the projected test year, we find this portion of his argument to be without merit.
Having made this determination, we are left with the question of whether the statute or decisions of this Court prohibit inclusion of CWIP in rate base. This Court has ruled that section 366.06(2), Florida Statutes, does not prohibit the inclusion of CWIP in rate base. Shevin v. Yarborough, 274 So.2d 505 (Fla. 1973). In Shevin, the Attorney General of Florida attacked the inclusion of CWIP on the basis that it failed to comport with the test applied by the Commission in a previous order. In response, the Court stated:
We have determined that the judgment of the Commission in this matter is in accord with the essential requirements of the law, supported by substantial competent evidence, and not a clear abuse of discretion.
Id. at 510. As illustrated by Shevin, inclusion of CWIP in rate base is a question of policy and Commission discretion. The policy should have a reasoned basis. Order No. 9864 provides an explanation of CWIP as a rate base adjustment. In that order the Commission sets forth some of the policy reasons and factors supporting its decision as follows:
The arguments for and against the inclusion of CWIP in rate base were fully developed before the Commission. Expenditures associated with construction may be accounted for in two ways. The interest costs may be capitalized through an Allowance for Funds Used During Construction, in which case no return is earned upon plant until it enters service. At that time such interest costs are recovered through higher depreciation rates. AFUDC appears on the current income statement in the form of non-cash earnings which are perceived as inferior in quality by investors.
Alternatively, CWIP may be included in rate base. In this situation, the utility earns a present return on its investment in new construction, and no allowance for funds is recorded on that portion of CWIP included in rate base. The advantages *538 of this alternative included greater cash flow and a higher quality of earnings, which should translate into lower perceived risk and a lower cost of capital. These aspects are especially beneficial in a situation involving a substantial construction program and a need for external financing. In addition, use of this alternative leads to a more gradual phasing in to the rate base (which is supported by rates charged to customers) of the large investments associated with new plant, as contrasted with the revenue requirement "jolt" which occurs when a utility requests approval of rates designed to provide a return on the total value of the new plant when it is placed into service.
Order 9864, Docket No. 800119-EU, at Sheet 5. In Order No. 10162, which amended Order No. 9864, the Public Service Commission also stated:
Having considered the position of the parties, we are persuaded that inclusion of an appropriate amount of CWIP in rate base constitutes a sound regulatory practice, and one which will realize net advantages over the long run in this case... .
Earnings on CWIP are real earnings, as opposed to the paper earnings made when relying upon AFUDC. The superior quality of earnings on CWIP is perceived by the investment community and reduces the cost of capital of a utility. Public utilities in Florida (and throughout the nation) are faced with extremely high capital financing costs at this time. Requiring a utility to carry these unrecovered financing costs, as opposed to relying in part on earnings on CWIP, places a burden on the utility that cannot justify reliance on AFUDC paper earnings. Florida is a growing state and, even though extensive conservation activities have been initiated, electric utilities in this state must obtain sufficient capital to meet their obligation to construct capacity to meet this growth. Placing CWIP in the rate base reduces the extreme burden of such construction requirements by providing real earnings, instead of paper earnings, as a means of attracting capital at reasonable rates.
Order No. 10162, Docket No. 800119-EU, at Sheet 4.
The standard on review is whether competent, substantial evidence supports a Commission order. Citizens v. Hawkins, 356 So.2d 254, 259 (Fla. 1978); De Groot v. Sheffield, 95 So.2d 912 (Fla. 1957). Orders of the Commission come before this Court clothed with the presumption of validity. On review this presumption of validity can only be overcome where the Commission's error either appears plainly on the face of the order or is shown by clear and satisfactory evidence. General Telephone Co. v. Carter, 115 So.2d 554, 556-57 (Fla. 1959). As this Court stated in Shevin:
[W]e will not overturn an order of the Commission because we would have arrived at a different result had we made the initial decision; something more is needed. However, we will not affirm a decision of the Commission if it is arbitrary and unsupported by substantial competent evidence, or in violation of a statute or a constitutionally guaranteed right.
274 So.2d at 509.
A review of the record demonstrates that there was considerable evidence on this issue presented before the Commission. Testimony in favor of inclusion of CWIP in rate base was given by John D. McClellan. Mr. McClellan cited several benefits associated with the inclusion of CWIP in rate base. Mr. McClellan testified, in part, that:
While current recovery involves higher rates in the short run, it is more than offset by lowered overall costs. (R. Vol. 17, pp. 2056, 2058). The actual cost to consumers, when measured on a present value basis, will be the same under current recovery as under the AFUDC approach. There are economic and financial factors, however, which may be expected to reduce the costs under current recovery and to give the rate payers a benefit in the long run.
He went on to enumerate other advantages which included:

*539 (1) Financial benefits; including improved cash flow, reduced risk, reduction of capital costs, long term decrease in cost of services, and improved coverages;
(2) Smoother rate increases as a result of the gradual phasing in of rate base additions that accompanies the CWIP approach. This avoids dramatic impacts to the public;
(3) Possible reduction of ad valorem taxes;
(4) Pricing signals reflecting increased costs more quickly;
(5) The impact of price elasticity is leveled out and energy conservation may be accelerated.
We are unable to agree with Public Counsel's contentions that the Commission's decision on this issue shows a clear abuse of discretion on the part of the Commission. The burden is on the party claiming the order of the Commission to be invalid, arbitrary, or unsupported by the evidence. Shevin, 224 So.2d 505 at 508. Fogarty Bros. Transfer Inc. v. Boyd, 109 So.2d 883 (Fla. 1959). Public Counsel has not met this burden. The Commission has set forth its policy reasons for including CWIP in this case and such policy has a reasoned basis. We find the decision of the Commission to include approximately $207 million of CWIP in the rate base to be supported by substantial competent evidence, and not in violation of a statute or constitutionally guaranteed right and, therefore, we must affirm on this issue.
The next issue presented is whether the Commission erred in granting the interim rate increase. Public Counsel contends that this Court's decision in Maule Industries v. Mayo, 342 So.2d 63 (Fla. 1976), precluded an award of interim rate relief on any basis other than an historic test year. Public Counsel relies on a footnote in that opinion wherein this Court stated:
Section 366.06(4) authorizes Commission action to suspend rates for up to 8 months after their filing `pending a final order ... in any rate proceeding....' (emphasis added [by the court]). Technically, it is not necessary for a utility to file a separate request for interim relief since the statute operates to make it available in conjunction with all rate relief requests. It follows, of course, and we so held in the Gulf Power case [333 So.2d 1 (Fla. 1976)], that the interim rate procedures enacted in 1974 are an integral part of the general and more elaborate process for obtaining rate increases. See also Citizens of Florida v. Mayo (Florida Power Corp.), 316 So.2d 262, 264 (Fla. 1975). As such, an interim award could never be requested or granted on the basis of a test year different from that used as a basis for the permanent rate increase request. The Commission erred in allowing FP & L to employ a different year for the temporary and partial portion of its permanent and full request. Although that error complicated the accounting aspects of this case, our disposition of the interim rate award makes it unnecessary to solve the accounting difficulties. The procedures used in this case demonstrate why, as a result of the enactment of file and suspend procedures for Florida utilities, these companies may now find it undesirable to file rate hike requests on the basis of a `projected' test year, as was done here. They may, rather, have to choose between that accounting mechanism to minimize regulatory lag and the use of an historic accounting test year on the basis of which they can justify immediate rate relief under the new statutory mechanism. The handicap in being forced by the new statutory scheme to make that choice is not apparent, however. We note that in this proceeding, without any serious discussion or argument, FP & L obtained the benefit of four utility-favoring techniques of rate-making  the file and suspend procedure, the use of a year-end rate base, the benefit of automatic fuel adjustment clauses, and the use of a projected test year.
Id. at 66 n. 5.
Maule was one of the first cases filed under the "file and suspend" procedure of section 366.06(4), Florida Statutes (1979). *540 In Maule, Florida Power & Light (FP & L) had filed its rate application in August, 1974, seeking permanent and interim rate increases based on a partly projected test year ending in December, 1974. The Commission suspended FP & L's proposed interim rates, which were based on the partly projected data, but later granted an interim increase when FP & L supplied data based on a fully historic year ending in September. This Court ruled that the Commission erred in granting an interim increase based on a test year different from that on which the permanent rate petition was based. We think it is wrong to suggest that the footnote in Maule was a judicial determination that interim rate relief is never available in a projected test year case. The Court was merely acknowledging the Commission's demonstrated reluctance at that time to base interim rates on projected data.
Public Counsel contends that this Court's recent decision in United Telephone Co. v. Mann, 403 So.2d 962 (Fla. 1981), prohibits the Commission from basing interim rates on anything but "known and easily measureable changes which have caused the utility's rates to be unjust and unreasonable." Id. at 967 (footnote omitted). He asserts that projected data is neither known nor easily measurable but gives no basis for this assertion. In United Telephone, this Court upheld the Commission's refusal to consider at an interim hearing extensive supplemental testimony concerning the cost of common equity in the calculation of the rate of return after having received substantial previous testimony on the point. The Court was clearly upholding the Commission's discretion to determine, on a case by case basis, what evidence it will consider in fixing interim rates.
The statutory standard imposed upon the Commission is to fix "fair, just and reasonable rates." §§ 366.06(2), 366.05(1), Florida Statutes (1979). This Court has consistently recognized the broad legislative grant of authority which these statutes confer and the considerable license the Commission enjoys as a result of this delegation. As noted earlier, the Commission's approval of a 1980 test year in this case was made against a background of five years of experience under the File and Suspend Law after Maule. In addition, through the workshops resulting in the approval of the test year, the Commission evaluated operating characteristics peculiar to Florida Power and familiarized itself with sophisticated methods of projecting data which demonstrated the need for increased rates. Having approved the use of a 1980 test year on this background, the Commission could adequately evaluate projected data in conformance with its statutory obligations.
The purpose of section 366.06(4), which gives the Commission the authority to award interim relief, is to protect utilities from the "regulatory lag" associated with full blown rate proceedings. Florida Power Corp. v. Hawkins, 367 So.2d 1011, 1013 (Fla. 1979). In Citizens of Florida v. Mayo (Gulf Power Co.), 333 So.2d 1 (Fla. 1976), this Court analyzed section 366.06(4), the File and Suspend Law, and the legislative intent underlying its enactment. It is clear that the evidentiary basis for an interim increase need not be subject to the same intense scrutiny, cross-examination, and adversarial contest as is required in the final public hearings. Where, however, the Commission chooses to conduct public hearings in an interim rate proceeding, intervenors, including Public Counsel, will be afforded all procedural due process rights to insure their effective participation. 333 So.2d at 7. As this Court stated in Gulf Power:
Whether public hearings are scheduled or not, the test to support an interim rate increase should be whether the Commission had additional or corroborative data on which to grant temporary rate relief at the time that it lifts its suspension  data which it did not initially have, or data which clarifies or amplifies matters initially found to be inadequate. The requisite showing, naturally, will vary from case to case, and judicial review of an interim award will be premised on the traditional test of whether the award is supported by competent and substantial *541 evidence. Section 120.68(10), Florida Statutes (1975).
Id. at 7.
The record shows that when the Commission suspended Florida Power's proposed rates, the Commission requested Florida Power to supplement its initial filing by providing the assumptions underlying its projections and the justifications for each assumption. After receiving the requested clarifying information, the Commission lifted its suspension and authorized Florida Power to collect increased interim rates, subject to refund. The Commission concluded that Maule did not prohibit the interim awards and that Florida Power had sufficiently demonstrated "a present need for an interim increase in revenues, as indicated by results projected for calendar year 1980 and corroborated by the historical data furnished by the Company." We find no departure from established procedures for setting interim rates in this case. Instead, those procedures were, if anything, more scrupulously followed in this case than in an historic test year case.
If Florida Power had not been permitted to collect interim rates during the 1980 test year, it could never recoup even a portion of the revenue shortfall experienced during that year, which shortfall was later confirmed by the actual historical data filed prior to the conclusion of the final hearing. The whole purpose of interim awards is to reduce regulatory lag; the sooner new rates can be implemented on an interim basis, the better the purpose of section 366.06(4) is served. We also affirm the Commission's interim rate award.
The final issue presented for our review is whether the Commission erred by allowing the increased permanent rates to apply to consumption occuring prior to the date Order No. 9864 was filed. The Commission set the effective date under section 366.072, Florida Statutes, (Supp. 1980), which provides:
Any order issued by the [Florida Public Service] commission adjusting general increases or reductions of the rates of an electric ... company shall be reduced to writing ... within 20 days of the official vote of the commission. Within said 20 days, the commission shall also mail a copy of the order to the clerk of the circuit court of each county in which customers are served who are affected by the rate adjustment... . The commission shall notify all parties of record in the proceeding of the date of such mailing. Such an order shall not be considered rendered for purposes of appeal, rehearing, or judicial review until the date the copies are mailed as required by this section. This provision shall not delay the effective date of the order. Such an order shall be considered rendered on the date of the official vote for the purposes of §§ 364.05(4) and 366.06(4).
Public Counsel contends that section 366.072 is inapplicable and that the effective date of the new rates is prescribed solely by section 120.52(9), Florida Statutes (1979), which defines a "final order" with reference to the time the written order is filed. Section 120.52(9) provides, in pertinent part:
"Order" means a final agency decision which does not have the effect of a rule... . (A)n agency decision shall be final when reduced to writing and filed with the person designated by the agency as clerk.
We cannot agree with Public Counsel's contention.
The Administrative Procedure Act (chapter 120, Florida Statutes) clearly ascribes only two functions to the concept of a final "order" as defined in section 120.52(9). One is that an order may not be judicially reviewed until it satisfies section 120.52(9). § 366.072, Fla. Stat. (Supp. 1980). The other is that the agency's decision may not be enforced under section 120.69 until it is reduced to written form and filed under section 120.52(9). Section 120.52(9) does not deal with the effective date of the order. Section 366.072 clearly deals with the effective date of a Commission action dealing with any rate proceeding under section 366.06. The rule in Florida is that where the language of the statute is so plain and unambiguous as to fix the legislative intent *542 and leave no room for construction, the courts should not depart from the plain language used by the legislature. Carson v. Miller, 370 So.2d 10 (Fla. 1979). In addition, another controlling tenet of statutory construction is the rule that words of common usage, when used in a statute, should be construed in their plain and ordinary sense. Tatzel v. State, 356 So.2d 787 (Fla. 1978). Section 366.072 clearly and unambiguously states that orders of the Commission are effective on the date of the vote of the Commission for purposes of the "File and Suspend" law. Section 366.072 clearly authorizes the Commission's action in this proceeding. This provision delays the running of the appeal time (or rehearing time) until everyone has a written order, but makes the rate adjustment effective on the date of the Commission's vote. This is certainly the most reasonable interpretation of the statute. Accordingly, Order No. 9864, as amended by Orders 10162 and 10162A, is affirmed in its entirety.
It is so ordered.
ALDERMAN, C.J., and BOYD, OVERTON, McDONALD and EHRLICH, JJ., concur.